IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

WILLIAM STEINER, individually
and on behalf of himself and
all others similarly situated,

              Plaintiffs,

    v.

MEDQUIST INC., BRIAN J.
KEARNS, DAVID A. COHEN, JOHN
A. DONOHOE, ETHAN COHEN, JOHN
W. QUAINTANCE, RONALD F.
SCARPONE, KPMG LLP and ARTHUR
ANDERSON,

              Defendants.

HON. JEROME B. SIMANDLE

Civil No. 04-5487 (JBS)

**OPINION**

---

APPEARANCES:

Joseph J. DePalma, Esq.
Janet Rita Bosi, Esq.
LITE DEPALMA GREENBERG & RIVAS LLC
Two Gateway Center
12th Floor
Newark, NJ 07012
    Liaison Counsel

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
200 Broadhollow Road
Suite 406
Melville, NY 11747
    Lead Counsel for Plaintiffs

Marc J. Gross, Esq.
Adam Brian Kaplan, Esq.
Olivier Salvagno, Esq.
GREENBAUM, ROWE, SMITH & DAVIS LLP
6 Becker Farm Road
Roseland, NJ 07068
    -and-

Neal R. Marder, Esq.
Gail J. Standich, Esq.
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
     Attorneys for Defendants MedQuist Inc. and Ronald Scarpone

David A. Kotler, Esq.
Megan Elizabeth Zavieh, Esq.
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543
     -and-
Robert J. Jossen, Esq.
DECHERT LLP
30 Rockefeller Plaza
New York, NY 10112
     Attorneys for Defendant David A. Cohen

John H. Lewis, Jr., Esq.
John J. Levy, Esq.
Janice G. Dubler, Esq.
MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
Liberty View
457 Haddonfield Road, 6th Floor
Cherry Hill, NJ 08002
     Attorneys for Defendant Ethan Cohen

Scott A. Resnik, Esq.
Joel W. Sternman, Esq.
Anthony L. Paccione, Esq.
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
     Attorneys for Defendant John A. Donohoe

Christopher M. DiMuro, Esq.
LATHAM & WATKINS, LLP
One Newark Center, 16th Floor
Newark, NJ 07101
     -and-

Edward J. Shapiro, Esq.
Gregory A. Harris, Esq.
Joshua K. Chandler, Esq.
LATHAM & WATKINS, LLP
555 11th St., N.W., Suite 1000
Washington, D.C. 20004
     Attorneys for Defendant Brian Kearns


Brian J. McCormick, Jr., Esq.
BUCHANAN INGERSOLL
700 Alexander Park
Suite 300
Princeton, NJ 08540
     -and-
Howard D. Scher, Esq.
Paul C. Madden, Esq.
BUCHANAN INGERSOLL
1835 Market Street, Floor 14
Philadelphia, PA 19103
     Attorneys for Defendant John W. Quaintance

Martin Wendel, Esq.
Eliot Lauer, Esq.
Michael J. Moscato, Esq.
Daria M. Ciaputa, Esq.
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
     Attorneys for Defendant Arthur Anderson, LLP

David J. Sheehan, Esq.
James M. Lee, Esq.
Michael R. McDonald, Esq.
GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCIONE, P.C.
One Riverfront Plaza
Newark, NJ 07102
     Attorneys for Defendant KPMG LLP

**SIMANDLE,** District Judge:

**I.**   **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . 6

     A.   <u>Background</u> . . . . . . . . . . . . . . . . . . . . 6

     B.   <u>Defendants</u> . . . . . . . . . . . . . . . . . . . 7

          1.   <u>Brian J. Kearns</u> . . . . . . . . . . . . . . 7

3

        2.    David A. Donohoe . . . . . . . . . . . . . 8

        3.    David A. Cohen . . . . . . . . . . . . . . 8

        4.    Ethan Cohen . . . . . . . . . . . . . . . 9

        5.    John W. Quaintance . . . . . . . . . . . . 9

        6.    Ronald F. Scarpone . . . . . . . . . . . . 10

        7.    Arthur Anderson, LLP . . . . . . . . . . . 10

        8.    KPMG LLP . . . . . . . . . . . . . . . . . 10

   C.    Billing Scheme . . . . . . . . . . . . . . . . 10

   D.    Billing Disputes . . . . . . . . . . . . . . . 12

   E.    MedQuist Acquisitions and Philips Merger and Insider
         Sales . . . . . . . . . . . . . . . . . . . . 13

   F.    Material Misrepresentations and Omissions . . . . . 14

   G.    Audit Reports . . . . . . . . . . . . . . . . . 15

   H.    Public Disclosures . . . . . . . . . . . . . . 16

        1.    March 16, 2004 Dow Jones Alert . . . . . . 16

        2.    March 24, 2004 Press Release . . . . . . . 17

        3.    March 31, 2004 Press Release . . . . . . . 18

        4.    May 14, 2004 Dow Jones Alert . . . . . . . 18

        5.    May 24, 2004 Press Release . . . . . . . . 18

        6.    June 15, 2004 Press Release Announcing Nasdaq
              Delisting . . . . . . . . . . . . . . . . 20

        7.    Post-Class Period Disclosures . . . . . . 20

   I.    Procedural History . . . . . . . . . . . . . . 21

II.  RULE 12(b)(6) STANDARD OF REVIEW . . . . . . . . . . . 22

**III.  DISCUSSION** . . . . . . . . . . . . . . . . . . . .  22

    A.  <u>Rule 10b-5 Claims</u> . . . . . . . . . . . . . .  22

        1.  <u>Materiality</u> . . . . . . . . . . . . . . .  25

            a.  <u>March 16, 2004 Dow Jones Alert</u> . . . . .  27

            b.  <u>March 24, 2004 Press Release</u> . . . . . .  28

            c.  <u>March 31, 2004 Press Release</u> . . . . . .  28

            d.  <u>May 14, 2004 Dow Jones Alert</u> . . . . . .  29

            e.  <u>May 24, 2004 Press Release</u> . . . . . . .  29

            f.  <u>June 15, 2004 Press Release Announcing
                Nasdaq Delisting</u> . . . . . . . . . . . .  30

        2.  <u>Misrepresentations or Omissions</u> . . . . . . .  37

        3.  <u>Scienter</u> . . . . . . . . . . . . . . . . .  47

        4.  <u>Loss Causation</u> . . . . . . . . . . . . . .  53

    B.  <u>Rule 10b-5(a) and (c) Scheme Liability</u> . . . . . .  58

    C.  <u>Section 20(a) Claims</u> . . . . . . . . . . . . . .  61

    D.  <u>Auditors</u> . . . . . . . . . . . . . . . . . . .  62

**IV.  CONCLUSION** . . . . . . . . . . . . . . . . . . . .  66

MedQuist, Inc. ("MedQuist" or the "Company") is a provider of medical transcription and healthcare information services.  In this putative class action under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), Plaintiffs allege a two-part scheme whereby MedQuist, six of its principal officers ("Individual Defendants"), and two of its outside auditors ("Auditor Defendants") (1) manipulated the Company's

billing scheme to unlawfully overcharge its customers and
underpay its employees for its medical transcription services;
and (2) knowingly reported false increased revenues and profits
between March 29, 2000 and June 14, 2004 ("Class Period").

Defendants have moved to dismiss the Second Amended
Complaint ("SAC") under Rule 12(b)(6), Fed. R. Civ. P., arguing
primarily that the Complaint is not pleaded with the requisite
particularity under the Private Securities Litigation Reform Act
of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and Rule 9(b) of the
Federal Rules of Civil Procedure.  For reasons explained in this
Opinion, the motions by the Company and the six Individual
Defendants will be denied, and the Court will grant the motions
by the Auditor Defendants who will be dismissed from this case.

**I.   FACTUAL BACKGROUND**

In this Rule 12(b)(6) dismissal motion, the Court will, as
it must, accept as true the well-pleaded allegations contained in
the SAC and consider the documents incorporated by reference
therein.  See In re Suprema Specialities, Inc. Sec. Litig., 438
F.3d 256, 264 (3d Cir. 2006).

A.   Background

MedQuist is a national provider of medical transcription
outsourcing and hospital document management services, including
digital dictation, transcription, Web-based coding, speech
recognition and document delivery systems.  (SAC ¶ 33.)  In the

late 1980's through the early 1990's, senior management at MedQuist instructed personnel to "pad headers and footers" to achieve desired billing amounts.  (Id. ¶ 34.)  The fraudulent billing scheme became more complex in 1998 when MedQuist began programming ratios and formulas into its various billing systems.[1]  Using that software, MedQuist "backward billed" its clients by setting the desired revenue profit amount and inflating its customer bills to achieve those results.  (Id. ¶ 39.)

B.   Defendants

Plaintiffs have alleged securities fraud claims against the Company, six of its principal officers, and two outside auditors retained to conduct independent audits.[2]

1.   Brian J. Kearns

Defendant Kearns was at all relevant times, until his resignation on July 30, 2004, MedQuist's Executive Vice President and Chief Financial Officer.  Kearns joined MedQuist as Senior

_____

[1] The SAC details how the allegedly fraudulent billing scheme worked.  (SAC ¶¶ 44-59.)  In short, the software utilized by MedQuist had the ability to count characters, lines and other invisible keystrokes or codes embedded in a document, instead of billing customers based on an AAMT line, defined as any line having 65 "characters."  See also Kanter v. Barella, 388 F. Supp. 2d 474, 475-76 (D.N.J. 2005) (explaining cost per line contract).

[2] Greater Pennsylvania Carpenters Pension Fund purchased MedQuist publicly traded securities during the Class Period.  On March 11, 2005 the Court appointed Greater Pennsylvania Carpenters Pension Fund as lead plaintiff. (SAC ¶ 19.)

Vice President, Treasurer and CFO on October 16, 2000.  Kearns was responsible for managing all accounting, treasury and investor relations functions.  (Id. ¶ 21.)

Kearns drafted, prepared, reviewed and signed the Forms 10-Q filed with the Securities Exchange Commission ("SEC") on August 14, 2002, November 14, 2002, May 13, 2003, August 12, 2003, and November 12, 2003, as well as the Form 10-K filed on March 25, 2003.[3]  Additionally, Kearns signed the Sarbanes-Oxley Act of 2002 certifications attached to these financial statements.

Kearns participated in conference calls on April 23, 2002, July 25, 2002, October 23, 2002 and February 13, 2003 in which the fraudulent billing scheme was discussed.  (Id.)

      2.   David A. Donohoe

Defendant Donohoe served as a MedQuist executive since 1994, first as Executive Vice President of medical transcription, and from 1995 through March 19, 2002 as Chief Operating Officer.[4] (Pls. Opp. Br. at 10 n.6)  After resigning, Donohoe remained at the Company as an advisor to MedQuist's management team through March 2004.  (SAC ¶ 23.)

_____

[3] As discussed in more detail below, Plaintiffs allege the statements contained in these filings were materially false or misleading.

[4] Plaintiffs acknowledge in their opposition papers that Donohoe was not the Company's CEO, as the SAC alleges.

8

3.   <u>David A. Cohen</u>

David Cohen was MedQuist's Chief Executive Officer and President at all relevant times until his July 6, 2003 resignation.  From that date until at least April 4, 2004, Cohen continued his service with the Company as a "Special Advisor" to the Board of Directors.  (<u>Id.</u> ¶ 22.)

David Cohen drafted, prepared, reviewed and signed the Form 10-K filed with the SEC on March 25, 2003, which Plaintiffs have alleged contained materially false and misleading statements. Mr. Cohen also signed the Sarbanes-Oxley Act of 2002 certifications on the March 25, 2003 Form 10-K, as well as the Forms 10-Q filed on August 14, 2002, November 14, 2002 and May 13, 2003.  (<u>Id.</u>)

David Cohen participated in the April 23, 2002, July 25, 2002, October 23, 2002 and February 13, 2003 conference calls in which the fraudulent billing scheme was discussed.  (<u>Id.</u>)

4.   <u>Ethan Cohen</u>

Ethan Cohen was serving as Chief Technology Officer of MRC Group, Inc. in December 1998 when that company merged with MedQuist.  (<u>Id.</u> ¶ 24.)  Mr. Cohen joined MedQuist as its Senior Vice President and CTO in 1998 and served in that capacity until he was promoted to Executive Vice President in October, 2002. Until his resignation on October 31, 2004, Ethan Cohen served as MedQuist's Executive Vice President and CTO.  (<u>Id.</u>)

5.   <u>John W. Quaintance</u>

Mr. Quaintance was MedQuist's Executive Vice President and Chief Operating Officer until his resignation on January 31, 2005, having joined the Company in 1986.  In February 2004, Mr. Quaintance was appointed COO responsible for all activities supporting implementation and delivery of MedQuist's transcription technology and services to its clients.  His primary accountability was for profit, customer satisfaction and customer relationships for over 2000 North American customers. Mr. Quaintance signed the Sarbanes-Oxley Act of 2002 certifications on the Form 10-Q filed on August 12, 2003.  (<u>Id.</u> ¶ 25.)

6.   <u>Ronald F. Scarpone</u>

Mr. Scarpone joined MedQuist in 1994 and, until his retirement on October 31, 2004, served as MedQuist's Executive Vice President of Marketing and Business Development.  (<u>Id.</u> ¶ 26.)

7.   <u>Arthur Anderson, LLP</u>

Arthur Anderson, LLP ("Anderson") is an international accounting firm that provided auditing services for the Company for fiscal years 1999, 2000 and 2001, and certified MedQuist's Forms 10-K for those fiscal years.  In addition, Anderson verified the Company's Form S-8 filed on July 26, 2002.  (<u>Id.</u> ¶ 28.)

10

8.   <u>KPMG LLP</u>

KPMG LLP ("KPMG") is an international accounting firm that provided auditing services for MedQuist for fiscal year 2002. (<u>Id.</u> ¶ 27.)

C.   <u>Billing Scheme</u>

As part of MedQuist's fraudulent billing scheme, CTO Ethan Cohen worked with COO Donohoe and CEO David Cohen to create technology to program the Company's computerized billing codes to overcharge its hospital customers for vital transcription services.  (<u>Id.</u> ¶¶ 51-57.)  The programs created a summary bill with no details, thereby making it virtually impossible for customers to verify the accuracy of the bills.  The software had been created by Ethan Cohen when he was CTO of the MRC Group, Inc., before its merger with MedQuist in 1998.  Once Ethan Cohen became CTO of MedQuist in 1998, he used that software to manipulate the billing formulas for MedQuist.  (<u>Id.</u> ¶¶ 50-57.)

MedQuist personnel had discussions with Defendants Donohoe and David Cohen about "what they wanted to be able to do, and then what they were doing" to use formulas and ratios to overcharge customers and underpay the Company's transcriptionists.  (<u>Id.</u> ¶¶ 218, 228.)  Throughout the Class Period, Donohoe and David Cohen instructed personnel to manipulate a higher billing result.  (<u>Id.</u>)  Specifically, David Cohen and Donohoe delegated to the remaining Individual

Defendants the task of implementing the billing and revenue scheme. (<u>Id.</u> ¶¶ 52-57, 71-79.)  For example, Donohoe directed Quaintance to "jack up" formulas to increase revenues and profit margins for Defendant Quaintance's region while he was Senior Vice President.  Billing summaries from that region reflect that Quaintance indeed utilized formulas to increase billings. (<u>Id.</u> ¶ 78.)

MedQuist employees said Donohoe was the "mastermind" of the manipulated billing scheme. (<u>Id.</u> ¶¶ 75-76, 122, 218, 228, 256.) At MedQuist's annual regional management meeting in Philadelphia in 2000, for example, Donohoe spoke to roughly 150 MedQuist managers and "bragged" about the way he used formulas to inflate billing revenue. (<u>Id.</u> ¶ 76.)  Moreover, Donohoe called MedQuist's Warmister office every month to direct increases and other adjustments in the billing formulas to carry out the scheme. (<u>Id.</u> ¶ 77.)

Defendant Scarpone was also intimately familiar with the fraudulent billing scheme: he gave instruction to Ethan Cohen about individual customer inflation levels and changes in those levels, met with programmers and personally reviewed the analyses created by programers analyzing the disputed bills. (<u>Id.</u> ¶ 62.)

D.    <u>Billing Disputes</u>

Eventually, billing disputes arose with a number of the Company's major clients including Duke University, USC Medical

12

Center, Welborn Medical Clinic, Kaiser Hospitals, Concentra Hospitals, Sutter Hospitals and Children's Hospital of Orange County.  (Id. ¶¶ 61-66.)

Scarpone reviewed the disputed bills and ultimately, the Company issued a credit to at least one of its clients.  (Id. ¶ 60.)  Moreover, Welborn filed a lawsuit against MedQuist.[5]  The Company has been authorized by its Board to offer up to $65 million as an "accommodation" to settle additional unresolved disputes.  (DePalma Decl. at 8.)

E.    MedQuist Acquisitions and Philips Merger and Insider Sales

MedQuist began an "acquisition binge" on April 6, 2000 with an announcement that it planned to acquire a 20% stake in A-Life Medical, Inc., an advanced natural language processing technology firm.  That announcement was followed by a series of acquisitions beginning in October 2000 and continuing through 2003.[6]  (Id. ¶¶ 97-99.)

In January 2000, MedQuist announced that it was looking for "new partners."  By May, a suitor had materialized and

_____

[5] The suit by Welborn eventually settled after Welborn arranged during mediation to have the Company transcribe and bill ten documents Welborn had, unbeknownst to MedQuist, previously submitted for billing.  MedQuist billed Welborn a different amount the second time around and the lawsuit subsequently settled.  (Id. ¶¶ 66-69; 118.)

[6] The SAC identifies the specifics of each transaction. (SAC ¶¶ 97-99.)

Koninklijke Philips Electronic N.V. ("Philips") had acquired 60% of MedQuist's shares – 57% under the tender offer and 3% from MedQuist's senior management.  (Id. ¶ 102.)  On May 22, 2000, Philips entered into Shareholder Agreements with Defendants David Cohen, Ethan Cohen, Donohoe and Scarpone, whereby Philips directly purchased MedQuist shares: David Cohen sold 779,530 shares for proceeds of $39,756,030; Donohoe sold 124,224 for $6,335,424; Scarpone sold 74,570 for $3,803,070; and Ethan Cohen sold 39,489 for $2,013,939.  (Id. ¶ 103.)  The Shareholder Agreements further provided that insiders, including the Individual Defendants here, were precluded from transferring or selling any additional MedQuist stock for at least two years beginning May 22, 2000.[7]  (Id.)

As announced in the Company's Schedule 14-A filing on April 28, 2003, Defendant Kearns was granted options to purchase 40,000 shares at $51.00 per share and 40,000 shares at $70.00, in addition to an award of options to purchase 30,000 shares at a strike price of $17.06.  Scarpone and Ethan Cohen were each granted 25,000 shares at a strike price of $51.00 and another 25,000 shares at a strike price of $70.00. (Id. ¶ 106.)  On

---

[7] Plaintiffs claim that Defendants David Cohen, Ethan Cohen, Scarpone and Donohoe were obligated by contract to continue their employment with MedQuist through May 2003 and, thus, had incentive to inflate financial results so as to maintain high share price.  (SAC ¶ 103.)

14

September 6, 2002, Scarpone sold MedQuist shares yielding
$317,508 in sales proceeds.  (Id. ¶ 107.)

      F.   Material Misrepresentations and Omissions

     Plaintiffs allege that in addition to fraudulently billing
its customers, MedQuist misled its investors by reporting
inflated financial results without disclosing the fraudulent
billing scheme.  Instead, during the Class Period MedQuist
attributed its financials to other legitimate business factors
such as "increased sales to existing customers, sales to new
customers and additional revenue from acquisitions."  (SAC ¶¶
114, 120, 136, 154, 163, 174, 183, 188, 196, 205 and 219.)  Such
allegedly misleading statements appeared in the March 29, 2000
Form 10-K, the May 11, 2000 Form 10-Q, the August 11, 2000 Form
10-Q, the November 13, 2000 Form 10-Q, the March 16, 2001 Form
10-K, the May 11, 2001 Form 10-Q, the August 9, 2001 Form 10-Q,
the November 9, 2001 Form 10-Q, the March 22, 2002 Form 10-K, the
May 14, 2002 Form 10-Q and the August 14, 2002 Form 10-Q.
Similarly, MedQuist attributed its increased revenues to
acquisitions without disclosing the underlying improper billing
scheme in its November 14, 2002 Form 10-Q and May 13, 2003 Form
10-Q.  (Id. ¶¶ 230, 253.)

     The SAC additionally identifies a number of other allegedly
false and misleading statements issued throughout the Class
Period.  (Id. ¶¶ 113-274.)

G.   <u>Audit Reports</u>

Plaintiffs further allege that during Anderson's and KPMG's respective audit reviews of MedQuist's financials, the assigned auditor was shown documents that clearly indicated the Company's bills were not counting characters, but instead using ratios and formulas to improperly inflate billing.  Nevertheless, neither Anderson nor KPMG followed up with MedQuist regarding the discrepancies between the actual billing terms and its customer contracts, even though both were provided to the auditors.  (SAC ¶ 80.)

Anderson issued Independent Auditors' Reports attached to the Forms 10-K for February 8, 2000, March 26, 2001, and March 20, 2002, and KPMG did so for the fiscal year 2002, stating that their audits were conducted in accordance with generally accepted auditing standards in the United States.  (<u>Id.</u> ¶ 115, 165, 197.) The audit reports also stated the auditors' professional opinions that the financial statements filed by MedQuist fairly presented their operations and cash flows for the respective periods. (<u>Id.</u>)

H.   <u>Public Disclosures</u>

1.   <u>March 16, 2004 Dow Jones Alert</u>

As customer and employee complaints mounted, Defendants' alleged scheme began to unravel, causing MedQuist on March 16, 2004 to file a Form 12b-25 Notification of late filing with the

SEC disclosing that the filing of its Form 10-K for the year ending December 31, 2003 would be delayed pending completion of an independent review of the Company's billing practices.  (SAC ¶¶ 275-77.)

The 12b-25 filing was reported by a Dow Jones Alert issued after the market close on March 16.  The Dow Jones Alert stated that MedQuist would delay the filing of its Annual Report on Form 10-K with the SEC pending a continuing review of "potential improper billing practices."  (SAC ¶ 275.)  According to that report, MedQuist announced that "a company employee raised issues on potential improper billing practices," and the Company "believe[d] some clients [had] been overcharged while others [had] been undercharged."  (Id.)  The Company also declared its intention to file the Form 10-K on or before March 30.  Finally, MedQuist "said it will record a reserve of $1.5 million regarding the billing issues," pending adjustment upon completion of a review by PricewaterhouseCoopers ("PwC").  (Id.)

        2.   March 24, 2004 Press Release

In a March 24, 2004 press release issued by MedQuist at 7:51 P.M. (EST), the Company reported that it would not be able to timely file its Form 10-K with the SEC by the March 30 extended filing deadline.  (SAC ¶ 277.)  The Company further stated that it would be "unable to predict when it will be in a position to file its Form 10-K."

MedQuist also announced that it was undergoing an audit of its billing practices with the assistance of outside counsel, Debevoise & Plimpton LLC ("Debevoise") and an independent auditor, PwC.  (Id. ¶¶ 277-78.)  Citing "concerns as to the progress of the review" being conducted by PwC, MedQuist announced that its Board of Directors had "assumed responsibility for completing the review of billing practices and related matters . . . ."  (SAC ¶ 277.)  Moreover, the Company stated that it would be unable to assess whether its review of billing practices "may have a material impact on its reported revenues, and consolidated results of operations and financial position." (Id.)

### 3.   March 31, 2004 Press Release

On March 31, 2004, MedQuist issued a press release at 6:35 P.M. (EST), announcing that it had received a Nasdaq Staff Determination letter informing the Company that it was subject to delisting for its failure to timely file its Form 10-K Annual Report.  MedQuist also announced its intention to request a hearing so as to avoid automatic delisting.

### 4.   May 14, 2004 Dow Jones Alert

On Friday, May 14, 2004 a Dow Jones Corporate Filings Alert issued at 6:00 A.M. announced that the Company would delay filing its Form 10-K for the year ending December 31, 2003, and that it would not be able to estimate the impact of the review.  (SAC ¶

280.)  Moreover, the Company stated that it did not know when the
review of its billing practices would be complete.  (Id.)
Finally, the Company announced that it filed its Form 10-Q for
the quarter ending March 31, 2004 out of time.

     5.   May 24, 2004 Press Release

    After the market closed on Monday, May 24, 2004, MedQuist
issued a press release entitled "MedQuist Receives Nasdaq Staff
Determination," which stated that on May 18, 2004 it had received
a Notice of Additional Delinquency from the Nasdaq Listing
Qualifications Hearings Department indicating that, in addition
to the Company's previously disclosed filing delinquency,
MedQuist had failed to timely file its Form 10-Q for the
quarterly period ending March 31, 2004.[8]  (SAC ¶ 282.)  That
letter also "serve[d] as formal notification that the company's
common stock is subject to delisting . . . as a result of the
company's failure to timely file the Form 10-Q . . . ."  (Id.)

    The Dow Jones Alert also stated that the Nasdaq Listing
Qualification Panel had conducted a hearing on April 29, 2004
regarding the Form 10-K filing delinquency, at which MedQuist
requested its common stock continue to be listed on Nasdaq.
Moreover, the press release stated that the Company had
supplemented its previous submissions to the Panel on May 24,

_____

    [8] As already noted, the May 14 Dow Jones Alert had disclosed
that MedQuist's Form 10-Q was not timely filed.

2004 in response to the Notice of Additional Delinquency.
Finally, MedQuist announced that it would not be able to file its
delinquent Form 10-K and Form 10-Q with the SEC until after
completion of an independent review of its billing practices.
(Id.)

      6.   <u>June 15, 2004 Press Release Announcing Nasdaq
         Delisting</u>

On June 15, 2004, MedQuist announced that it received notice
that shares of its common stock would be delisted from Nasdaq.
Immediately following the announcement, shares of MedQuist
"plunged" 17% to $10.53.  <u>See</u>
http://www.marketwatch.com/News/Story/Story.aspx?guid=%7B27F8CCD1
%2D3332%2D42F3%2DB5FC%2D25187178958B%7D&symb=MEDQ&sid=8798&siteid
=NYT&dist=NYT&osymb=MEDQ.  Shares of MedQuist stock closed that
day at $11.70 from the previous day's close of $12.81.  The stock
price slightly declined the following day to $11.60 and increased
by the close of the market on June 17 to $11.75.  Moreover,
shares traded on exceptionally high volume for those days –
926,400 shares, 1,338,000 shares, and 783,500 shares
respectively.[9]

---

[9] The Court can take judicial notice of MedQuist's stock
prices even on a motion to dismiss because these facts are "not
subject to reasonable dispute [and are] capable of accurate and
ready determination by resort to a source whose accuracy cannot
be reasonably questioned."  <u>In re Merck & Co. Sec. Litig.</u>, 432
F.3d 261, 264 n.3 (3d Cir. 2005) (quoting <u>Ieradi v. Mylan Lab.,
Inc.</u>, 230 F.3d 594, 600 n.3 (3d Cir. 2000)).

7.   Post-Class Period Disclosures

On July 30, 2004, MedQuist revealed the conclusions of the Debevoise and PwC audits, and acknowledged that ratios and formulas instead of the contracted AAMT line counts were used for billing.  The Board of Directors subsequently disciplined David Cohen, Donohoe, Scarpone, Kearns, and Ethan Cohen.[10]  (SAC ¶¶ 7-9; 285-86.)  That same day, MedQuist announced that the SEC Commission had commenced a formal investigation against the Company.  (Id. ¶¶ 10; 287.)

On November 2, 2004, MedQuist issued a press release announcing that its Board of Directors had concluded that the Company's previously issued financial statements included in its Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, should no longer be relied upon.  (Id. ¶¶ 290-92.)

I.  Procedural History

Plaintiffs filed this putative class action on November 8, 2004.  By Order dated March 11, 2005, the Court appointed Greater Pennsylvania Carpenters Pension Fund as Lead Plaintiff. Plaintiffs amended the complaint on August 16, 2005 and again on

---

[10] By Opinion and Order dated September 21, 2005, the Court dismissed a shareholder derivative action under Rules 23.1 and 12(b)(6), Fed. R. Civ. P., against MedQuist's Board of Directors. Kanter, 388 F. Supp. 2d 474.

November 15, 2005.  These motions to dismiss under Rule 12(b)(6)
of the Federal Rules of Civil Procedure followed.  The Court
heard oral argument on August 17, 2006.

## II.  RULE 12(b)(6) STANDARD OF REVIEW

A Rule 12(b)(6) motion must be denied "unless it appears
beyond doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to relief." Scheuer
v. Rhodes, 416 U.S. 232, 236 (1974).  A district court must
accept any and all reasonable inferences derived from those
facts.  Glenside West Corp. v. Exxon Co., U.S.A., Div. of Exxon
Corp., 761 F. Supp. 1100, 1107 (D.N.J. 1991); Gutman v. Howard
Sav. Bank, 748 F. Supp. 254, 260 (D.N.J. 1990).

However, a Complaint should be dismissed if, accepting all
plaintiff's allegations and the reasonable inferences to be drawn
therefrom, no relief could be granted under any set of facts to
be proved.  Watts v. Internal Revenue Service, 925 F. Supp. 271,
275 (D.N.J. 1996).  Although this Court must for the purposes of
a Rule 12(b)(6) motion read the Complaint indulgently, the Court
is not required to accept as true unsupported conclusions and
unwarranted inferences.  Schuykill Energy Resources v. PP&L, 113
F.3d 405, 417 (3d Cir. 1997).  There must be an actual,
actionable claim underlying the Complaint's allegations.  Hishon
v. King & Spalding, 467 U.S. 69, 73 (1984).

## III. DISCUSSION

A.   <u>Rule 10b-5 Claims</u>

Section 10(b) of the Exchange Act prohibits the "'use or employ, in connection with the purchase or sale of any security, . . . [o]f any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . .'"  <u>In re IKON Office Solutions, Inc. Sec. Litig.</u>, 277 F.3d 658, 666 (3d Cir. 2002) (quoting 15 U.S.C. § 78j(b)) (alteration in original).  Pursuant to this statutory authority, the Commission promulgated Rule 10b-5, creating a private right of action for investors harmed by materially false or misleading statements.  <u>In re Suprema</u>, 438 F.3d at 275 (citing <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 535 (3d Cir. 1999)).  Under Rule 10b-5, it is unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statement made[,] in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  <u>Id.</u> (quoting 17 C.F.R. § 240.10b-5(b)).

The elements of a claim under Section 10(b) of the Exchange Act are

> (1) a material misrepresentation (or omission); (2)
> scienter, i.e. a wrongful state of mind; (3) a
> connection with the purchase or sale of a security; (4)
> reliance, often referred to in cases involving public
> securities markets (fraud-on-the-market cases) as
> "transaction causation;" (5) economic loss; and (6)

23

"loss causation," i.e., a causal connection between the
material misrepresentation and the loss.

Id. (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005))
(citations omitted).[11]  Pursuant to the PSLRA, a Section 10(b)
claim must "specify each statement alleged to have been
misleading, the reasons why the statement is misleading, and, if
an allegation regarding the statement or omission is made on
information and belief, the complaint shall state with
particularity all facts on which that belief is formed."  15
U.S.C. § 78u-4(b)(1)(B).

In addition to the PSLRA requirements, "[c]omplaints
alleging securities fraud must also comply with Rule 9(b)" of the
Federal Rules of Civil Procedure, In re Advanta, 180 F.3d at 531,
which provides in part, "In all averments of fraud or mistake,
the circumstances constituting fraud or mistake shall be stated
with particularity."  Fed. R. Civ. P. 9(b).  "Rule 9(b) requires
a plaintiff to plead (1) a specific false representation [or
omission] of material fact; (2) knowledge by the person who made
it of its falsity; (3) ignorance of its falsity by the person to
whom it was made; (4) the intention that it should be acted upon;

---

[11] Defendants here do not challenge that the alleged
misstatements or omissions were made in connection with the
purchase of securities, that Plaintiffs relied on those
misstatements or omissions, or that they suffered economic loss.

24

and (5) that the plaintiff acted upon it to his damage." In re Rockefeller Center Prop. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (internal quotation marks and citation omitted).

 1. Materiality

 "Rule 9(b) requires a plaintiff to plead . . . a specific false representation [or omission] of material fact . . . ." In re Rockefeller Center Prop. Sec. Litig., 311 F.3d at 216. "[E]stablishing materiality is the 'first step' for a plaintiff with a section 10(b) claim." In re Merck & Co. Sec. Litig., 432 F.3d 261, 268 (3d Cir. 2005) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)).

 Material information is "information that would be important to a reasonable investor in making his or her investment decision." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1425.  Undisclosed information is generally considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (citing In re Westinghouse Sec. Litig., 90 F.3d 696, 714 (3d Cir. 1996)); see Basic Inc. v. Levinson, 485 U.S. 224, 231-232 (1988).

 The Third Circuit's "1997 Burlington opinion created a standard for measuring the materiality of statements in an

efficient market.[12]   In 2000, [the court] ratified the

Burlington standard post-PSLRA in Oran v. Stafford," In re Merck,

432 F.3d at 269, where the court explained:

> In Burlington . . . [the Third Circuit] fashioned a
> special rule for measuring materiality in the context
> of an efficient securities market.  This rule was
> shaped by the basic economic insight that in an open
> and developed securities market like the New York Stock
> Exchange, the price of a company's stock is determined
> by all available material information regarding the
> company and its business.  In such an efficient market,
> "information important to reasonable investors . . . is
> immediately incorporated into the stock price."
> Burlington, 114 F.3d at 1425.  As a result, when a
> stock is traded in an efficient market, the materiality
> of disclosed information may be measured post hoc by
> looking to the movement, in the period immediately
> following disclosure, of the price of the firm's stock.
> Because in an efficient market "the concept of
> materiality translates into information that alters the
> price of the firm's stock," if a company's disclosure
> of information has no effect on stock prices, "it
> follows that the information disclosed . . . was
> immaterial as a matter of law."  Burlington, 114 F.3d
> at 1425.

Oran v. Stafford, 226 F.3d at 282.  In other words, for

information to be material, a company's disclosure of that

---

[12] Class Plaintiffs "need[] the market to be efficient.
With an efficient market [they] can use the fraud-on-the-market
theory, which allows [them] to meet [their] section 10(b)
reliance requirement."  In re Merck, 432 F.3d at 270 n.8 (citing
Burlington, 114 F.3d at 1415 n.1, 1419 n.8).  The
fraud-on-the-market theory supposes that "'the price of a
company's stock is determined by the available material
information regarding the company and its business.'"  Basic Inc.
485 U.S. at 241 (quoting Peil v. Speiser, 806 F.2d 1154, 1160 (3d
Cir. 1986)).  The Third Circuit, "as compared to the other courts
of appeals, has one of the 'clearest commitments' to the
efficient market hypothesis."  In re Merck, 432 F.3d at 269.

information must have a negative effect on stock prices.[13]  See
In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002)
(finding disclosed information immaterial as a matter of law
where there was "no negative effect" on company's stock price
immediately following disclosure); Lentell v. Merrill Lynch &
Co., Inc., 396 F.3d 161, 175 (2d Cir. 2005) (explaining
plaintiffs must allege that "the market reacted negatively to a
corrective disclosure" to state a claim under Section 10(b)).

Here, Plaintiffs allege that the price of the stock was
negatively affected immediately following a series of partial
disclosures.

---

[13] Plaintiffs and Defendants here both rely on Oran v.
Stafford, 226 F.3d at 282, for the proposition that in an
efficient securities market, to be deemed "material" a company's
disclosure of bad news must cause a decline in stock price.  For
reasons explained, a rise in share price does not preclude a
finding that the information was material as a matter of law, so
long as the share price was otherwise "negatively affected."  For
example, information may be material where its disclosure causes
a stock to increase by less than it otherwise would have; or stay
constant where it would have otherwise increased.  See Dura
Pharm., Inc. v. Broudo, 544 U.S. 336, 343 (2005); Michael J.
Kaufman, At a Loss: Congress, The Supreme Court and Causation
Under the Federal Securities Laws, 2 N.Y.U. J. L. & Bus. 1, 46-48
(2005) (explaining that "economic loss" under Dura requires at
minimum a showing that investor suffered loss by purchasing
securities at artificially inflated price without mitigating that
loss by reselling those securities at that same inflated price;
for example, plaintiff who purchases at $100, but resells at $125
at some point after misrepresentations are disclosed, may suffer
economic loss if sale price would have been higher in absence of
fraud).

a.  <u>March 16, 2004 Dow Jones Alert</u>

First, as already noted, on March 16, 2004 Dow Jones reported that MedQuist announced it would delay the filing of its Annual Report on Form 10-K with the SEC pending a continuing review of "potential improper billing practices" that may have resulted in some clients being overcharged and others being undercharged.  The report also announced that MedQuist "said it will record a reserve of $1.5 million regarding the billing issues," pending adjustment upon completion of a review by PwC.

The day following this disclosure, shares of MedQuist common stock fell to $15.78 from the previous day's close of $15.95, and then to $15.74 by March 18, 2004, representing a total decline of roughly 1.3% in the stock price.[14]  (Pls. Ex. 3.)

b.  <u>March 24, 2004 Press Release</u>

Next, following the March 24, 2004 press release in which the Company reported it would not be able to timely file its Form 10-K with the SEC by March 30, MedQuist shares dropped from $15.79 to $15.51, and then to $15.35 the following day on particularly heavy volume as compared with the several weeks prior.

---

[14] That the price of the stock may not have declined more significantly does not preclude a finding of materiality as a matter of law especially considering that Plaintiffs allege these were only partial disclosures and that the negative information may have been offset by what the market perceived as positive news.

28

c.   <u>March 31, 2004 Press Release</u>

Following the March 31 press release announcing that MedQuist had received a Nasdaq Staff Determination letter informing the Company that it was subject to delisting, shares of MedQuist stock rose to $16.31 on Thursday, then $16.49 on Friday, with approximately 40,000 and 54,000 shares being traded on those days.  When the market opened the following Monday, April 5, 2004, shares fell to $16.15, to $16.11 on Tuesday, and finally to $15.51 on Wednesday.  Volume was moderate for all trading days except for April 6, 2004, when the volume roughly doubled to 102,900 shares traded.

d.   <u>May 14, 2004 Dow Jones Alert</u>

Following the Friday, May 14 Dow Jones Alert reporting that MedQuist would delay filing its Form 10-K and that it would not be able to estimate the impact of the review of its billing practices, shares rose on moderately light trading to $13.87 from the previous day's close of $13.03.  When the market opened the following Monday, the volume doubled the previous two weeks' average, and share prices fell to $12.92.  The share price continued to fall each day that week until a close of $12.24 on May 21.

e.   <u>May 24, 2004 Press Release</u>

After the market closed on Monday, May 24, 2004, MedQuist issued a press release stating it had received a Notice of

29

Additional Delinquency, and that MedQuist would not be able to file its delinquent Form 10-K and Form 10-Q with the SEC until after completion of an independent review of its billing practices.  The next day, on light trading, shares rose to $13.18 from the previous day's close of $12.38.  Shares continued to trade at low volumes (30,150 to 37,590) for the remainder of the week, and the stock price ultimately dropped to $12.33, below the pre-disclosure price.

              f.   June 15, 2004 Press Release Announcing Nasdaq Delisting

Finally, on June 15, 2004, MedQuist announced that it received notice that shares of its common stock would be delisted from Nasdaq.  Immediately following the announcement, shares of MedQuist "plunged" 17% to $10.53.  See http://www.marketwatch.com/News/Story/Story.aspx?guid=%7B27F8CCD1 %2D3332%2D42F3%2DB5FC%2D25187178958B%7D&symb=MEDQ&sid=8798&siteid =NYT&dist=NYT&osymb=MEDQ.  Shares of MedQuist stock closed at $11.70 from the previous day's close of $12.81.  The stock price slightly declined the following day to $11.60 and increased by the close of the market on June 17 to $11.75.  Moreover, shares traded on exceptionally high volume for those days – 926,400 shares, 1,338,000 shares, and 783,500 shares respectively.

Plaintiffs argue that based on the foregoing they have pleaded materiality with the requisite particularity.  Defendants argue that the Third Circuit's decision in Ieradi v. Mylan Labs.,

Inc., 230 F.3d 594 (3d Cir. 2000), "lays each of Plaintiff's arguments to rest."  (MedQuist Reply Br. at 6.)  This Court disagrees with Defendants.  In that putative class action, plaintiff brought claims under Section 10(b) based on the alleged failure by defendant Mylan Laboratories, Inc. ("Mylan"), a leading drug manufacturer, to disclose certain information relating to an FTC investigation stemming from increases in the prices of several of Mylan's drugs.  The plaintiff there purchased Mylan stock on October 26, 1998, several months after the investigation by the FTC had been publicly disclosed on July 6, 1998.  Following the initial disclosure, the company's stock price fell sharply from a closing high of $35 on July 17, 1998, and continued to decline every successive day thereafter but one, until its close at $25 on August 4, 1998.

On December 5, 1998, a little over one month after plaintiff purchased stock in the company, the public learned that the FTC had notified Mylan that it was preparing to sue the company. Immediately following that disclosure, the stock price again dropped, from $34-3/8 on Friday, December 4, to $31-5/16 on Monday, December 7.  Plaintiff then filed a putative class action alleging that Mylan's failure to attribute its continued growth and increased revenue to two exclusive supply contracts artificially inflated Mylan's stock price.  According to plaintiff, by failing to disclose the existence of those

31

contracts Mylan artificially inflated the stock price by concealing from investors the risk that the FTC investigation would materialize into a civil antitrust action.

The district court dismissed the complaint, finding that the failure to disclose the exclusive supply contracts was not material.  In "find[ing] support for the District Court's conclusion that disclosure of the two exclusive contracts was immaterial in the action of the stock market that followed the FTC investigation," the Third Circuit noted that the drop of ten points following the initial disclosure of the investigation in July was "more than 300 per cent in excess of the 3 1/6 'plummet' that occurred several months after the plaintiff purchased stock on October 26, 1998."  Id. at 599-600.  In other words, the court upheld the district court's conclusion that disclosure of the two supply contracts would not have significantly altered the "total mix" of information made available to investors because the December price decline was insignificant compared with the substantial drop following disclosure of the FTC investigation months before.  Id.

Defendants here rely on Ieradi for the proposition that once a risk is publicly disclosed, that the same risk may eventually materialize is insignificant for purposes of Section 10(b) liability.  Thus, Defendants argue, the June 15, 2004 announcement that MedQuist would be delisted was not material

32

because the market already knew of that risk based on earlier
disclosures.  Indeed, Defendants contend, not only did the market
know that delisting was a risk, the market did not care, as
reflected in the slight increase in stock price following the
March 31 and May 24 announcements that MedQuist was subject to
delisting.  This Court finds Ieradi distinguishable for a number
of reasons.

First, the market's reaction to the initial disclosure of
the risk in Ieradi was markedly different than it was here.  In
Ieradi, as already noted, the stock price sharply declined once
it was disclosed that the FTC was investigating Mylan – in other
words, once the risk of a lawsuit was announced.  Here, on the
other hand, the market hardly reacted to news that MedQuist was
subject to delisting; instead the stock price actually increased
in the days immediately following the March 31 and May 24
disclosures trading on very light volume – approximately 20,000
to 50,000 shares per day.  The movement in the stock price
following the disclosures was therefore relatively insignificant.
Moreover, in Ieradi the market reaction to the second disclosure
announcing the lawsuit – that the risk had materialized – was
relatively insignificant.  Here, in contrast, as reported on June
15, 2004, MedQuist's shares "plunged" some 17% to $10.53
following news that the company's stock would be delisted.  See
http://www.marketwatch.com/News/Story/Story.aspx?guid=%7B27F8CCD1

%2D3332%2D42F3%2DB5FC%2D25187178958B%7D&symb=MEDQ&sid=8798&siteid
=NYT&dist=NYT&osymb=MEDQ.

In light of the above, this Court is not willing to find, as
Defendants are essentially asking it to, that _Ieradi_ announced
some per se rule that once a risk is disclosed to investors, the
materialization of that risk, without more, is necessarily
immaterial.  While the materialization of a previously disclosed
risk was immaterial in _Ieradi_ based on the market's reaction to
news of the FTC suit, the undisputed historical data here
reflects a quite different scenario.  Here, while investors found
the threat of delisting relatively _unimportant_ (the stock price
moved only slightly on light volume following the March 31 and
May 24 announcements), the market's reaction to the June 15, 2004
announcement indicates that news that the Company would actually
be delisted significantly altered the total mix of information
available to investors (the stock price "plunged" on very heavy
volume).  Accordingly, the Court finds that Plaintiffs here have
pleaded with particularity that information disclosed in the June
15 announcement was material.[15]

Additionally, the Court finds it important that information
relating to the underlying fraud here is alleged to have been

---

[15] To the extent Defendants argue that the June 15
disclosure did not directly relate to the unlawful billing
scheme, the issue is not one of materiality but of loss
causation, which the Court will discuss below.

revealed through a series of partial disclosures rather than a single corrective disclosure.[16]  In such circumstances, where only tidbits of information are being released to the public at a time, the concomitant market reaction will likely be similarly restrained.  Here, for example, while the Company revealed on March 16 that it was reviewing its billing practices, it also stated that it believed that some customers may have in fact been undercharged.  (SAC ¶ 275.)  Moreover, MedQuist stated that it would record a reserve of only $1.5 million regarding the billing issues, far less than the appropriate amount according to Plaintiffs' allegations here.  Because, as Plaintiffs allege, these partial disclosures did not reveal the true extent of the underlying billing scheme, the inflation was not completely removed from the stock price upon these announcements.  The company's disclosure that the billing problems may have resulted in a net overcharge of just $1.5 million, whereas Plaintiffs allege that the actual overbillings were many multipliers of that figure, does not provide a reliable benchmark with which to conclude that the earlier financial misstatements were immaterial.

Defendants point to the market's reaction in the days following the March 31 and May 24 disclosures as support for

---

[16] The parties here agree that a single corrective disclosure is not necessary to state a 10(b) cause of action.

their argument that investors simply did not care about the alleged underlying fraud; indeed, Defendants point out, the stock price actually rose immediately following those disclosures.  In the first instance, however, as explained above, the share price declined immediately following those price increases.  Moreover, relatively light volume accompanied the price increases while the subsequent price declines occurred upon higher volume.

Finally, as revealed above, at least to a certain degree the March 31 and May 24 disclosures contained information that had previously been disclosed.  For instance, by March 31 investors already knew from previous disclosures that the Company would not timely file its Form 10-K Annual Report.  Likewise, by May 24 investors knew that the Form 10-Q for the period ending March 31 would not be filed on time.  Therefore, to the extent that Defendants rely on the stock price increases in the days following March 31 and May 24 as support for their position that investors did not care about the underlying fraud, such reliance is misplaced, especially considering the market's reaction to the other partial disclosures cited by Plaintiffs.

While significant price declines following disclosures would make for an easier case for plaintiffs, companies required to make truthful and accurate financial disclosures do not escape 10(b) liability simply by leaking incomplete information into the marketplace over a period of time, rather than all at once.

After all, the securities laws were enacted to protect "the investing public and the national economy through the promotion of 'a high standard of business ethics . . . in every facet of the securities industry.'" Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 315 (1985) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186-87 (1963)).

For these reasons, the Court finds that based on the pleadings as well the trading activity of MedQuist shares from 2000 through 2004, of which this Court has taken judicial notice, Plaintiffs here have sufficiently pleaded materiality under the standard articulated by the Third Circuit in Burlington, 114 F.3d at 1425.[17]

### 2.   Misrepresentations or Omissions

As already noted, Section 10(b) claims are subject to the requirements of the PSLRA as well as Rule 9(b) of the Federal Rules.  Under the PSLRA, a Section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the

---

[17] In any event, because that information was not so obviously unimportant to investors, the Court must let a jury decide this issue.  Ieradi, 230 F.3d at 599 (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 n.11 (3d Cir.), cert. denied, 506 U.S. 934 (1992) and Ballan v. Wilfred Am. Educ. Corp., 720 F. Supp. 241, 249 (E.D.N.Y. 1989) (explaining where there is room for differing opinions on issue of materiality, question should be left for jury determination)).

complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Moreover, Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission and, "at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." In re Suprema, 438 F.3d at 276-77 (quoting In re Rockefeller, 311 F.3d at 217).

Here, Plaintiffs allege multiple misstatements/omissions by Defendants during the Class Period contained in fifteen press releases, four annual reports, twelve quarterly reports, and a number of conference calls with analysts and stockholders. Plaintiffs claim that Defendants' failure to disclose that the Company's revenues were inflated as a result of a fraudulent billing scheme rendered those statements false.

Defendants argue that Plaintiffs have failed to plead with particularity facts that show any of the challenged statements were false or misleading when made because Plaintiffs have not alleged that the financial disclosures themselves were false. As a result, Defendants contend, Defendants had no duty to disclose the allegedly fraudulent billing scheme. In short, Defendants maintain that "[a]bsent some nexus between the alleged

representations and the underlying alleged misconduct, there is simply no duty to disclose . . . ."  (MedQuist Br. at 45.)

In support of their position, Defendants cite several cases standing for the proposition that there can be no Section 10(b) liability as a matter of law when there is no allegation by Plaintiffs that MedQuist did not receive and book the dollar amounts reported.  (Id. at 38.)  In other words, Defendants argue that isolated statements of factual revenues allegedly generated by improper activities do not give rise to Section 10(b) liability.

In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997), held that while a securities violation could be premised on false or misleading "hard information," "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." (emphasis added) (citing In re Convergent Tech. Sec. Litig., 948 F.2d 507, 512-13 (9th Cir. 1991)).  In that case the plaintiffs did not challenge the accuracy of the "hard" numbers pertaining to publicly reported sales and earnings.  Id. at 401. Instead, the plaintiffs alleged that they paid inflated prices for the company's stock where, among other things, the company failed to disclose that it was engaging in illegal promotion of its products when it helped fund a particular non-profit foundation.  The court affirmed the dismissal of the complaint

under Rule 12(b)(6), holding that whether the company's activities were lawful was a matter of opinion, which the company had no duty to disclose unless such "predictions" were "substantially certain to hold," and the court held they were not.  Id. at 402.

Defendants also cite Greenstone v. Cambex Corp., 975 F.2d 22, 24 (1st Cir. 1992), a pre-PSLRA case, which held that "accurate" "statements . . . of figures" including revenue, income, profit and balance sheets could not be misleading as a matter of law "unless, given the circumstances, an investor would normally have expected to find some kind of qualification of the figures, disclosing a significant potential liability."  Thus, for example, the court there held that a company's financial statements need not disclose "potential liability" arising from a particular practice "unless . . . it is considered probable that a claim will be asserted and there is a reasonable probability that the outcome will be unfavorable."  Id. (citing Financial Accounting Standards Board Statement No. 5, § 10).  Because in that case the court found that the defendant company and its officers did not know that a particular lawsuit that had not yet been filed was "probable" at the time, the court found the company's financial statements could not give rise to Section 10(b) liability.  See also Kushner v. Beverly Enterprises, Inc., 317 F.3d 820 (8th Cir. 2003) (affirming dismissal of complaint

where statements regarding company's belief that it was in
substantial compliance with Medicare regulatory requirements were
insufficient as matter of law to form basis of Section 10(b)
claim because they were based on "'soft information,' which
company was not required to disclose").

These cases stand for the proposition that isolated
statements of revenues can not give rise to Section 10(b)
liability, even when allegedly generated by improper activities,
if the figures reported are factually accurate.  These cases are
not inconsistent, however, with the proposition that Section
10(b) liability can arise when defendants know that statements
putting the source of the company's revenue at issue are false or
misleading, even though the financials themselves are otherwise
accurate.  Plaintiffs have pleaded facts consistent with this
theory of 10(b) liability.

In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677
(S.D.N.Y. 1990), held that statements that were "literally true"
could be found by a reasonable jury to be "false and misleading,"
thereby giving rise to Section 10(b) liability, "if a reasonable
investor, in the exercise of due care, would have received a
false impression from the statement."  In that case, "Plaintiffs
allegedly purchased Par's stock at inflated prices because Par's
public statements and filings with the Securities and Exchange
Commission failed to disclose that Par and its subsidiary had

41

made illegal payments to government officials to expedite
approval of the companies' applications for permission to
manufacture certain drugs." Id. at 672.  Plaintiffs there cited,
among others, Par's statements in a series of public filings that
the company's ability to secure speedy FDA approval for its
products was because of its "legitimate business acumen and
ingenuity," rather than the illegal bribery scheme alleged by the
plaintiffs.  Id. at 673.

Noting that under Rule 10b-5 corporate officers are
obligated to speak truthfully on a matter once they undertake to
make certain statements and are required to make such additional
disclosures as are necessary to avoid rendering the statements
made misleading, the court concluded:

> A reasonable jury could find that, by extolling Par's
> ability to obtain FDA approvals, by comparing Par's
> success in this regard to other companies in the
> industry and to its own previous performance, and by
> projecting continued success in obtaining rapid
> approvals, the statements conveyed to a reasonable
> investor the false impression that Par had a particular
> expertise in obtaining FDA approvals constituting a
> legitimate competitive advantage over other companies
> and that this advantageous expertise was responsible
> for its success in obtaining FDA approvals.

Id. at 677-78.  For these reasons, In re Par Pharm. held that a
reasonable jury could find these statements misleading to a
reasonable investor.  Id.

In re Van Der Moolen Holding N.V. Sec. Litig., F. Supp. 2d
388, 400-01 (S.D.N.Y. 2005), held that "although a defendant does

not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'" (quoting In re Prividian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 824-25 (E.D.Pa. 2001) (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281-82 (3d Cir. 1992) (when defendant affirmatively characterizes management practices as, for example, "adequate," "conservative," "cautious," and the like, "the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations"); United Paperworkers Int'l Union v. Int'l Paper Co., 801 F. Supp. 1134, 1143 (S.D.N.Y. 1992)).  In re Van Der Moolen Sec. Litig., 405 F. Supp. 2d at 392, involved a complaint that alleged the defendant company failed to disclose that throughout the class period its majority-owned subsidiary derived a substantial share of its revenue from illegal trading practices and that subsequent declines in the company's revenues were directly attributable to the apparent cessation of such practices.  For example, the plaintiffs alleged that the company's CEO stated, "in exceedingly turbulent market circumstances we were able to maintain our second quarter result

at almost the level we achieved in the first quarter.  The
development of our NYSE business showed once again that trading
volumes and price volatility determine our opportunities to
trade."  Id. at 401.  The court held that "[s]tatements such as
these put the sources of . . . revenue at issue" and, thus,
[u]nder the circumstances[] the alleged failure to disclose the
true sources of such revenue could give rise to liability under
Section 10(b)."  Id.

     Recently, In re Marsh & McLennan Co. Sec. Litig., 2006 U.S.
Dist. LEXIS 49525, at *36 (S.D.N.Y. July 19, 2006), noted that
while the proposition underlying the court's holding in In re Van
Der Moolen "is reasonable," that decision "may be interpreted to
hold that the statements which put the sources of revenue at
issue triggered a general duty to disclose the role of improper
conduct in generating that revenue."  Accordingly, In re Marsh &
McLennan clarified that while "the isolated statement of actual
revenues allegedly generated by improper activities does not
create Section 10(b) liability," liability may nonetheless attach
to the misleading statement itself.  Id. at *37-39 (citing In re
Sofomar, 123 F.3d at 401).  In other words, a company's
misleading statements about the source of its revenues may give
rise to liability but will not itself make the company's
financial statements untrue or misleading.  Therefore, in that
case the court dismissed the plaintiffs' claims under Section

10(b) that the defendant company had misstated its earnings solely by virtue of its failure to disclose the existence of steering and bid manipulation.  Id. at *39.

Here, the Court holds that Plaintiffs have adequately pleaded that Defendants' statements putting the source of the Company's revenue at issue were misleading, thereby stating a Section 10(b) cause of action.  Specifically, in a number of public filings reporting revenue, MedQuist failed to disclose its billing scheme, instead attributing its revenues to legitimate business factors such as "increased sales to existing customers, sales to new customers and additional revenue from acquisitions." That statement was included in each of the following financials: the March 29, 2000 Form 10-K, the May 11, 2000 Form 10-Q, the August 11, 2000 Form 10-Q, the November 13, 2000 Form 10-Q, the March 16, 2001 Form 10-K, the May 11, 2001 Form 10-Q, the August 9, 2001 Form 10-Q, the November 9, 2001 Form 10-Q, the March 22, 2002 Form 10-K, the May 14, 2002 Form 10-Q, the August 14, 2002 Form 10-Q, the November 14, 2002 Form 10-Q and the May 13, 2003 Form 10-Q.  (SAC ¶¶ 114, 120, 136, 154, 163, 174, 183, 188, 196, 205, 219, 230 and 253.)  These statements put the source of MedQuist's revenue at issue and, therefore, the Company's failure to disclose a major source of that revenue – the improper billing scheme – was misleading.

45

Plaintiffs also argue that the Company's statements were necessarily false considering the Company's November 2, 2004, press release announcing that its Board of Directors had concluded that the Company's previously issued financial statements included in its Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, should no longer be relied upon.  (Id. ¶¶ 290-92.)

Plaintiffs cite In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp. 2d 211 (D. Mass. 1999), for the proposition that a restatement of earnings, or the intention to do so, is evidence that the statement of earnings was false when made.  In Peritus, the class plaintiffs alleged an improper revenue recognition scheme and brought a securities fraud suit challenging as misleading eight statements made by the company that contained representations regarding the company's financial results for four quarters, which were eventually restated downward.  Each of the eight statements was alleged to have been misleading for improperly recognizing revenue – i.e., plaintiffs alleged that in one particular quarter the revenue report recognized revenue for sale of a product that was never actually sold, and that for a different quarter the company had reported revenue on a particular transaction that should not have been recorded in any quarter.  Id. at 222.  The court there held that

46

"[b]ecause [the class] is able to cite particular transactions," the plaintiffs had properly alleged that the challenged financial statements were materially misleading based solely on the later corrective accounting action.  Id. at 223.

Here, Plaintiffs have alleged that throughout the Class Period MedQuist overcharged its customers by improperly utilizing formulas and ratios rather than counting characters as defined by the customer contracts.  The Court finds that the Second Amended Complaint pleads with particularity how the scheme was devised, who devised it, and how it was implemented.  (SAC ¶¶ 33-79.) Taken together with the undisputed fact that the Company's Board of Directors informed investors not to rely upon the financial statements included in the Company's Form 10-K for the fiscal year ending December 31, 2002, its Form 10-Q filed during 2002 and 2003, and all earnings releases and similar communications relating to such periods, the Court finds that Plaintiffs have pleaded with particularity that a number of Defendants' statements and public filings during the Class Period were false or misleading.

### 3.  Scienter

The PSLRA also requires that a Section 10(b) plaintiff plead scienter with particularity.[18]  See GSC Partners CDO Fund v.

---

[18] Specifically, the PSLRA states in pertinent part:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state

47

<u>Washington</u>, 368 F.3d 228, 237 (3d Cir. 2004).  It is well-settled within this Circuit that scienter may be established in either of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

---

of mind, the complaint shall, with respect to each act of omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).  "To the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with scienter, 15 U.S.C. § 78u-4(b)(2), the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'" <u>In re Suprema</u>, 438 F.3d at 277 (quoting <u>In re Advanta</u>, 180 F.3d at 531 n.5).

misbehavior or recklessness."[19]  In re Suprema, 438 F.3d at 276
(quoting Burlington, 114 F.3d at 1418).

Additionally, the Third Circuit has endorsed "a variant of
the totality of circumstances approach," but only on "those
occasions . . . presenting unusually suspicious circumstances."
In re Rockefeller Center Properties, Inc., 311 F.3d at 224; see
In re Suprema, supra (noting for section 10(b) claims against an
auditor that liability can arise based on a showing that
"specific and not insignificant accounting violations
collectively raise an issue of scienter"); see also In re
Cabletron Sys., Inc., 311 F.3d 11, 39 (1st Cir. 2002) (holding
"plaintiff may combine various facts and circumstances indicating

---

[19] Where plaintiffs claim that defendants had the motive and
opportunity to commit securities fraud, fraudulent intent will
not be inferred from the mere sale of stock by some officers.  In
re Suprema, 438 F.3d at 277.  However, sales of company stock by
insiders that are "unusual in scope or timing . . . may support
an inference of scienter."  Id. (quoting In re Advanta, 180 F.3d
at 540).  Whether a sale is "unusual in scope" depends on factors
including "the amount of profit made, the amount of stock traded,
the portion of stockholdings sold, or the number of insiders
involved."  Id. (quoting Wilson v. Bernstck, 195 F. Supp. 2d 619,
635 (D.N.J. 2002)) (citations omitted).  Courts should also
consider in determining whether a stock sale is unusual in scope
whether the profits were substantial relative to the seller's
ordinary compensation.  Id. (citing In re Burlington Coat
Factory, 114 F.3d at 1423).
     Here, the Court finds Plaintiffs' allegations of motive and
opportunity in connection with officers' sale of stock to be
insufficient, especially considering that the Individual
Defendants were precluded from transferring or selling MedQuist
stock until at least May, 2002.  Additionally, the SAC alleges
only a single transaction after that time by Defendant Scarpone,
which yielded only approximately $317,000.  The Court finds
nothing unusual about this stock sale supporting an inference of
scienter.  However, as explained below, Plaintiffs have otherwise
adequately pleaded scienter.

fraudulent intent – including those demonstrating motive and opportunity – to satisfy the scienter requirement" under Section 10(b)). "When the alleged fraud is based on non-disclosure of facts, evidence that the defendants had actual knowledge of the facts is sufficient to show scienter." In re Great Atlantic Tea Co. Sec. Litig., 2004 U.S. App. LEXIS 14175, at *11 (3d Cir. July 9, 2004).

Finally, "a complaint can meet the pleading requirement dictated by [the PSLRA] by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." California Public Employees' Ret. Sys. V. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004). "[W]here plaintiffs rely on confidential personnel sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." In re Cabletron, 311 F.3d at 29 (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)).

Defendants here argue that the allegations in the Complaint are conclusory such that they cannot as a matter of law give rise to the requisite strong inference of scienter. To the contrary, the Court finds that Plaintiffs have alleged particularized facts that constitute at the very least strong circumstantial evidence of conscious misbehavior or recklessness on the part of the

Individual Defendants.  In re Suprema, 438 F.3d at 276 (quoting
Burlington, 114 F.3d at 1418).

     The Second Amended Complaint alleges with particularity
that each of the Individual Defendants knowingly implemented the
scheme through their actions and, thus, each was aware of its
existence.  As detailed at length in the Complaint, CTO Ethan
Cohen worked with COO Donohoe and CEO David Cohen to create the
technology to program the Company's computerized billing codes to
overcharge its hospital customers.  (Id. ¶¶ 51-57.)  Moreover,
the programs Ethan Cohen used created a summary bill with no
details, thereby making it virtually impossible for customers to
verify the accuracy of the bills.

     MedQuist personnel had discussions with Defendants Donohoe
and David Cohen about "what they wanted to be able to do, and
then what they were doing" to use formulas and ratios to
overcharge customers and underpay the Company's
transcriptionists.  (Id. ¶¶ 218, 228.)  Throughout the Class
Period, Donohoe and David Cohen instructed personnel to
manipulate a higher billing result and they delegated to the
remaining Individual Defendants the task of implementing the
billing and revenue scheme.  (Id. ¶¶ 52-57, 71-79.)  For example,
Donohoe specifically directed Quaintance to "jack up" formulas to
increase revenues and profit margins for Defendant Quaintance's
region while he was Senior Vice President.  Moreover, billing

summaries from that region reflect that Quaintance indeed utilized formulas to increase billings.  (Id. ¶ 78.)

MedQuist employees said Donohoe was the "mastermind" of the manipulated billing scheme.  (Id. ¶¶ 75-76, 122, 218, 228, 256.) At MedQuist's annual regional management meeting in Philadelphia in 2000, for example, Donohoe spoke to roughly 150 MedQuist managers and "bragged" about the way he used formulas to inflate billing revenue.  (Id. ¶ 76.)  Moreover, Donohoe called MedQuist's Warmister office every month to direct increases and other adjustments in the billing formulas to carry out the scheme.  (Id. ¶ 77.)  Finally, the Complaint alleges that certain of the Individual Defendants participated in conference calls on April 23, 2002, July 25, 2002, October 23, 2002 and February 13, 2003, at which times the fraudulent billing scheme was discussed.

The Court finds that based on these allegations, especially considering the controlling positions of the Individual Defendants within the Company, Defendants Ethan Cohen, Kearns, Quaintance, Scarpone, Donohoe and David Cohen had direct knowledge of the fraudulent billing scheme at the time they

issued the false or misleading statements described above.[20]

Accordingly, Plaintiffs have sufficiently pleaded scienter.

_____

[20] Plaintiffs here argue that scienter can be established solely by way of the "group pleading" doctrine.

> The group pleading doctrine "allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" However, the doctrine "is extremely limited in scope. Courts . . . have construed the doctrine as applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions."

In re Van der Moolen, 405 F. Supp. 2d at 398-99 (citations omitted) (noting the majority rule in the Second Circuit is that the group pleading doctrine has survived the PSLRA). But see Southland Sec. Corp. v. INSpire Soln. Inc., 365 F.3d 353, 364 (5th Cir. 2004) (noting that the Fifth Circuit never adopted the group pleading doctrine, even before the PSLRA, but that the doctrine cannot withstand the PSLRA's specific pleading requirements in any event).

In light of the Court's holding here that Plaintiffs have otherwise sufficiently pleaded scienter, the Court need not address whether allegations based solely on group pleading can establish a strong inference of scienter. The Court notes, though, that if the group pleading doctrine remains viable, this case likely falls within its limited scope as Plaintiffs have alleged that the corporate insider defendants here had "active daily roles" in MedQuist and the relevant overbilling transactions. But see In re Bio-Technology Gen. Corp. Sec. Litig., 380 F. Supp. 2d 574, 584 (D.N.J. 2005) ("The Third Circuit has not expressly determined whether group pleading has survived enactment of the PSLRA. Nevertheless, the prevailing authority within this District counsels that group pleading has been abolished.") (citing cases); Majer v. Sonex Research, Inc., 2006 U.S. Dist. LEXIS 49531, at *27-28 (E.D. Pa. July 19, 2006) ("Group pleading, as opposed to the specific identification of who made alleged misrepresentations, is insufficient under the Reform Act.") Nonetheless, this Court's holding is independent of the viability, if any, of the group pleading doctrine.

4.   Loss Causation

"Under section 10(b), plaintiffs have to plead loss causation – i.e., that the misrepresentation caused the stock price drop."[21]   In re Merck & Co. Sec. Litig., 432 F.3d 261, 274 (3d Cir. 2005) (citing Oran v. Stafford, 226 F.3d at 277).   The test in the Third Circuit for loss causation requires a plaintiff to show a "sufficient causal nexus between the loss and the alleged [nondisclosure]."   Newton, 259 F.3d at 181 n.24 (quoting Semerenko v. Cendant Corp., 223 F.3d 165, 184 (3d Cir. 2000)).[22]

---

[21] Actually, causation under Rule 10b-5 is two-pronged. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001) (citing Huddleston v. Herman & MacLean, 640 F.2d 534, 549 n.24 (5th Cir. 1981), aff'd in part, rev'd in part on other grounds, 459 U.S. 375 (1983); James D. Cox, Robert W. Hillman & Donald C. Langevoort, Securities Regulation: Cases and Materials 769-71 (3d ed. 2001); 5 A. Jacobs, The Impact of Rule 10b-5 § 64.01[a], at 3-221 to 3-222 (Supp. 1980)).   In addition to loss causation, plaintiffs must also demonstrate reliance, or "transaction causation."   Newton, 259 F.2d at 172. Transaction causation "establishes that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security."   Id. (citing Suez Equity Investors, L.P. and SEI Assocs. v. Toronto-Dominion Bank, 250 F.3d 87, 95-96 (2d Cir. 2001); Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997)).   Defendants here do not contest the sufficiency of the pleading of transaction causation.

[22] Following Newton, the Supreme Court decided Dura, supra, which examined the ways in which a plaintiff may satisfy the loss causation requirement.   However, Dura, 544 U.S. at 346, left open the issue of whether the pleading of loss causation is governed by Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure.   Defendants here argue that the pleading standard is not dispositive in this case in any event as Plaintiffs have failed "to specifically identify a significant price decline 'after the truth became known.'"   (MedQuist Reply Br. at 13, citing Dura, 544 U.S. at 347.   Contrary to Defendants' argument, however, Dura held only that "[t]he complaint's failure to claim

"In other words, to establish loss causation, a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss."[23]  Id. (citations omitted); see Lentell, 396 F.3d at 173 (holding loss causation will be established if relationship between plaintiff's investment loss and information concealed by defendant is "sufficiently direct").  The "causation issue becomes most critical at the proof stage.  Whether the plaintiff has proven causation is usually reserved for the trier of fact." EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000).

Here, Defendants argue that the SAC is deficient as a matter of law because it does not allege "[a] material decline in stock

_____

that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient.  The complaint contains nothing that suggests otherwise."  (Emphasis added).  In other words, the Court did not require plaintiffs in a Section 10(b) action to allege a significant price decline caused by the alleged misstatement.

[23] "The PSLRA codified [the] judge-made requirement" of loss causation:

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violated this chapter caused the loss for which the plaintiff seeks to recover damages.

Emergent Capital, 343 F.3d at 197 (quoting 15 U.S.C. § 78u-4(b)(4)).

price following a corrective disclosure – <u>i.e.</u>, a release of information directly related to the alleged fraud . . . ." (MedQuist Br. at 33.)  Initially, however, as already noted above, the stock price need only <u>negatively respond</u> to the disclosures; a significant drop in the price is not required. Moreover, as Plaintiffs point out, "a firm that lies about some assets cannot defeat liability by showing that other parts of its business did better than expected, counterbalancing the loss." <u>Goldberg</u>, 890 F.2d at 966.  Indeed, as the Supreme Court in <u>Dura</u> recognized in dictum, a plaintiff may sustain a Section 10(b) action where a share's higher price is actually lower than it would otherwise have been so long as the plaintiff can show that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."[24]  544 U.S. at 346.

Here, Plaintiffs allege that certain negative disclosures were offset by positive news, thereby masking the negative effect on the stock price.  For example, following a March 16, 2004 Dow

---

[24] To be sure, as already noted, <u>Dura</u> held that a complaint's failure to claim that the company's share price fell significantly after the truth became known may suggest that the plaintiffs consider the allegation of purchase price inflation alone sufficient, which it is not.  544 U.S. at 347.  However, the Court there also recognized that even in the absence of allegations that share price significantly decreased, a complaint may otherwise suggest that the economic loss was caused by more than mere purchase price inflation.  <u>Id.</u>

Jones Corporate Filings Alert stating that MedQuist believed that "some clients have been overcharged <u>while others have been undercharged</u>," the stock, trading on unusually high volume, decreased from a close price of $16.250 the prior day to $15.740 on March 18.  According to the SAC, this partial disclosure[25] resulted in a price decline that was less than it would have been absent the offsetting "positive information" that certain clients were undercharged.  Moreover, the immediate market response to this press release indicates that the disclosure proximately caused the alleged economic loss.

Additionally, the SAC is replete with allegations that the stock price was negatively affected following a number of partial disclosures revealing the fraudulent billing scheme:

- Following the March 16, 2004 Dow Jones Alert, shares dropped to $15.74 from the previous day's closing price of $15.95.

- On March 24, 2004, following a MedQuist press release disclosing that it would not meet the SEC filing deadline for its Annual Report on 10-K and that the Company would be engaging independent outside counsel to conduct a review of billing practices, the stock price declined over the course of three days from $15.82 to $15.35 on unusually heavy trading.

- Following a May 14, 2004 report in which MedQuist was reported as saying it could not estimate when its internal review, its audit for the 2003 fiscal year and its preparation of unaudited financial statements for the quarter ending March 31 would be complete, the

---

[25] The parties agree that revelation of the truth may occur through a series of disclosing events rather than a single complete disclosure.  (MedQuist Reply Br. at 15.)

> share price dropped from $13.87 to $12.24 over the
> course of several days.
>
> •    On June 15, 2004, following news that MedQuist's common
>      stock would be delisted by Nasdaq because the
>      investigation into its unlawful billing practices
>      prevented it from timely filing its Form 10-Q for the
>      quarterly period ending March 31, 2004, the share price
>      significantly declined on heavy trading.

(Pls. Ex. 3.)

Defendants also argue that the disclosure that MedQuist
would be delisted did not directly relate to the underlying fraud
and, thus, Plaintiffs cannot prove loss causation.  (MedQuist
Reply Br. at 12.)  Plaintiffs argue, and the Court agrees, that
the June 15 press release "provides direct linkage" to the fraud
because the decision to delist the stock was caused directly by
the investigation into the Company's billing practices.  While
the March 31 and May 24 press releases publicly disclosed that
MedQuist's SEC filings would be delayed because of an internal
investigation into improper billing practices, MedQuist continued
to withhold from the market the seriousness and the extent of
that alleged fraud.  Indeed, as already noted, MedQuist stated
publicly that while some clients had been overcharged, others had
been undercharged.  In fact, through the date of oral argument
herein, MedQuist has not made known the true extent of its
improper (or at least incorrect) billing practices.

As compared with prior disclosures, however, the June 15
announcement gave investors greater insight into the magnitude of

the potential scheme as well as the complexity of the internal
investigation, which had by that time spanned over three months
with no end in sight.  In other words, the June 15 announcement
revealed previously undisclosed information to the market that
investors found to be significant, as reflected in the immediate
negative market reaction.  The Court finds that at the very
least, Plaintiffs have provided Defendants with "some indication
of the loss and the causal connection that the plaintiff has in
mind."  Dura, 544 U.S. at 348.  Accordingly, the Court holds that
Plaintiffs have properly pleaded loss causation.

B.  Rule 10b-5(a) and (c) Scheme Liability

Plaintiffs argue that the Individual Defendants may also be
held liable on the basis of "scheme liability" for their
manipulative conduct as well as their false statements and
omissions.  (Pls. Opp. Br. at 38.)  Defendants argue that
Plaintiffs cannot succeed on that theory of liability because
they have not plead facts alleging that Defendants used a device
other than alleged misrepresentations to artificially inflate the
price of MedQuist's stock.  (MedQuist Reply Br. at 27.)

Under Rule 10b-5:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to
defraud,

59

(b) To make any untrue statement of a material fact or
to omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5.  There can be no aiding and abetting

liability under this Rule.  Central Bank of Denver v. First

Interstate Bank of Denver, 511 U.S. 164 (1994).

The Eighth Circuit recently held that "any defendant who

does not make or affirmatively cause to be made a fraudulent

misstatement or omission, or who does not directly engage in

manipulative securities trading practices,[26] is at most guilty

of aiding and abetting and cannot be held liable under § 10(b) or

any subpart of Rule 10b-5."  In re Charter Communications, Inc.,

Sec. Litig., 443 F.3d 987, 991-92 (8th Cir. 2006).

In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161,

173 (D. Mass. 2003), held that "the better reading of § 10(b) and

Rule 10b-5 is that they impose primary liability on any person

who substantially participates in a manipulative or deceptive

---

[26] As used by the Supreme Court in the securities context,
manipulative trading practices is a "term of art" that refers to
illegal trading practices such as "wash sales, matched orders, or
rigged prices, that are intended to mislead investors by
artificially affecting market activity."  Santa Fe Indus., Inc.
v. Green, 430 U.S. 462, 476-77 (1977).

scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."

Likewise, the Ninth Circuit recently held that "[i]f a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)," Simpson v. AOL Time Warner Inc., 452 F.3d 1040 (9th Cir. 2006), regardless of whether that individual has made a material misstatement or omission.  ("We see no justification to limit liability under § 10(b) to only those who draft or edit the statements released to the public.") The Court here finds this reasoning persuasive, and concludes that Plaintiffs here have also adequately pleaded scheme liability under Section 10(b).

As recounted at length above, the Complaint includes particularized allegations that each of the Individual Defendants knowingly implemented the billing scheme through their actions. For example, Plaintiffs allege that Ethan Cohen, at the direction of David Cohen and Donohoe, created and modified the software that MedQuist used to overcharge its customers. (SAC ¶¶ 5, 55-

57.)  Similarly, Plaintiffs allege that Defendants Donohoe, David Cohen, Quaintance, Kearns and Scarpone specifically instructed Defendant Ethan Cohen and members of his department about individual customer inflation and changes in those levels.  (Id. ¶¶ 52, 70-79.)

The Court finds these allegations sufficient to make out a claim for Section 10(b) scheme liability.

C.   Section 20(a) Claims

Finally, Plaintiffs seek to hold the Individual Defendants liable as "control persons" under Section 20(a) of the Securities and Exchange Act of 1934.  That provision imposes joint and several liability upon one who controls a violator of Section 10(b).[27]  15 U.S.C. § 78t(a); see In re Suprema, 438 F.3d 256. "In addition to control, culpable participation must be proved before control person liability for misrepresentations attaches." In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J.

---

[27] Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

1998) (citing <u>Rochez Bros., Inc. v. Rhoades</u>, 427 F.2d 880, 890 (3d Cir. 1975)).

Defendants here argue that Plaintiffs' Section 20(a) claim, alleging that the individual defendants are liable as "control persons," fails as a matter of law because (1) Plaintiff has not sufficiently pled a primary violation of the securities laws; and (2) Plaintiff has not alleged facts demonstrating that the individuals were controlling persons.  For reasons already explained, the Court finds that Plaintiffs have sufficiently alleged primary violations of Section 10(b).

Moreover, the Court finds that Plaintiffs have adequately detailed the manner in which the Individual Defendants are alleged to have controlled MedQuist's business and operations and, for reasons already explained, acted as culpable participants in the fraud.  Accordingly, the Court finds that Plaintiffs have sufficiently pled that the six principal officer Defendants were control persons within the meaning of Section 20(a).

D.   <u>Auditors</u>

Plaintiffs also seek to hold Defendants KPMG LLP and Arthur Anderson, LLP liable under Section 10(b).  "When a professional opinion is issued to the investing public by those in a position to know more than the public, there is an obligation to disclose data indicating that the opinion may be doubtful."  <u>In re</u>

63

Suprema, 438 F.3d at 279 (citing Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985)).  When such opinion is

> based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may "support[] an inference that when [the defendant] expressed the opinion that it had no genuine belief that it had the information on which it could predicate that opinion."

Id. (quoting McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979))(alteration in original).

"A showing that an auditor either lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit' has traditionally supported a finding of liability, even in the face of assertions of good faith."  In re Suprema, 438 F.3d at 279.  So too have allegations of Generally Accepted Accounting Standards violations, coupled with allegations that "significant 'red flags'" were ignored.  Id.  However,

> the mere second-guessing of calculations will not suffice' [plaintiffs] must show that [the auditor]'s judgment — at the moment exercised — was sufficiently egregious such that a reasonable accountant reviewing the facts and figures should have concluded that [the company]'s financial statements were misstated and that as a result the public was likely to be misled.

Id. (quoting In re IKON, 277 F.3d at 673).  Of course, the allegations must be pled with particularity.  Id. at 281 (holding

64

claims against auditor sufficient where complaint alleged thirty
significant "red flags").

Here, Plaintiffs seek to hold liable Anderson and KPMG for
their Independent Auditor's Reports accompanying the Company's
Form 10-K on February 10, 2000, March 26, 2001, March 20, 2002,
and March 3, 2003.  (SAC ¶¶ 115, 165, 197, 244.)  For the
following reasons, Plaintiffs' allegations against the Defendant
Auditors are insufficient.[28]

First, Plaintiffs allege that the assigned auditors were
shown but essentially ignored "documents that clearly indicated
MedQuist's billings were not counting characters, but rather
using ratios and formulas."  (SAC ¶¶ 80, 249.)  Second,
Plaintiffs argue that the auditors should have known of the
underlying fraud as a result of the lawsuits that had been filed
by customers.  Finally, Plaintiffs cite mounting customer
complaints as evidence of Defendants' sufficiently egregious
auditing practices.

The Court agrees with Defendants that the three "red flags"
cited by Plaintiffs are not significant and, therefore, are

---

[28] Additionally, as to KPMG the Court notes that the only
statement which Plaintiffs claim was false or misleading was
issued <u>after</u> the start of the Class Period.  "Because
[Plaintiffs] have failed to allege valid claims [against KPMG]
based on statements made before they purchased their [MedQuist]
stock, the post-purchase statements cannot be a basis for
liability."  <u>Klein v. General Nutrician Companies, Inc.</u>, 186 F.3d
338, 345 (3d Cir. 1999).  Accordingly, for this reason as well
Plaintiffs' claims against KPMG must fail as a matter of law.

insufficient as a matter of law.  First, as to the documentary
"red flags" Plaintiffs have not alleged what documents were shown
to the auditors, nor how those documents standing alone suggested
that they were unreliable.  Indeed, Plaintiffs allege that
MedQuist withheld material information from the auditors and lied
about the Company's fraudulent billing practices.  In other
words, Plaintiffs' theory of liability is self-defeating in that
the SAC alleges a fraudulent billing scheme that utilized
"secret" codes, which left no "paper trail," thereby making it
"impossible" for the auditors to "compare and analyze MedQuist's
reports in relation to billings."[29]  (Anderson Reply Br. at 5,
citing SAC ¶¶ 3, 50-53.)

      Next, Plaintiffs argue that mounting customer complaints and
lawsuits by customers challenging MedQuist's billing practices
should have alerted the auditors to the underlying billing
scheme.  However, Plaintiffs allege only a single lawsuit by
Welborn Medical Center.  (SAC ¶¶ 66-69.)  Likewise, Plaintiffs
have identified only a handful of customer complaints.  (Id. ¶
61.)  Considering that MedQuist had a customer base numbering in

---

[29] In re Suprema permitted a similar argument to go past the
pleading stage, but there the plaintiffs had additionally alleged
roughly thirty "not insignificant accounting violations."  438
F.3d at 281.  Here, on the other hand, Plaintiffs have only cited
three "red flags," none of which this Court finds sufficient as a
matter of law.

the thousands, these alleged red flags are insignificant as a matter of law.

_____For these reasons, even accepting as true all the allegations and the reasonable inferences to be drawn therefrom, Plaintiffs have not alleged significant red flags that should have alerted the Defendant auditors to the fraud.  Plaintiffs have not pled scienter as to the Auditor Defendants with the requisite particularity and, therefore, the Complaint will be dismissed as to KPMG and Anderson for failure to state a claim on which relief may be granted.

## IV.   CONCLUSION

As explained above, although Rule 9(b) and the PSLRA were designed to erect barriers to frivolous strike suits, they were not intended to make meritorious claims impossible to bring. Cabletron, 311 F.3d at 30.  The Company and the Individual Defendants here, however, are attempting to make Plaintiffs prove their claims at the pleading stage.  Because Plaintiffs have pleaded their securities fraud claims against Defendants MedQuist, Scarpone, David Cohen, Ethan Cohen, Quaintance, Kearns and Donohoe with the requisite level of particularity and specificity, their motions to dismiss will be denied.

However, for reasons explained the Court finds the Second Amended Complaint deficient as to the Auditor Defendants.

67

Accordingly, the motions to dismiss by Anderson and KPMG will be granted.

The accompanying Order will be entered.


**September 29, 2006**                **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      U.S. District Court